■ In the Matter of the Estate of JAMES E. SAN GIACOMO, Deceased. HELEN SAN GIACOMO, as Administratrix of the Estate of JAMES E. SAN GIACOMO, Deceased, Respondent; LOUIS SAN GIACOMO et al., as Executors of THOMAS SAN GIACOMO, Deceased, et al., Appellants.— In a proceeding by the administratrix of a decedent's estate to discover decedent's property (Surrogate's Ct. Act, § 205) consisting of five shares of the capital stock of each of two corporations (Cornwall Paper Company and San Giacomo Company of Orange, N. J.), the two corporations and two of their stockholders (Louis San Giacomo and the executors of Thomas San Giacomo) appeal from so much of an order of the Surrogate's Court, Orange County, made September 7, 1962

upon the court's decision after a nonjury trial: (1) as adjudged that the administratrix is the owner and entitled to the possession of such shares of stock; and (2) directed appellants to deliver to her the certificates representing such shares. Order, insofar as appealed from, affirmed, with costs, payable by the appellants personally. No opinion. Christ, Brennan and Hill, JJ., concur; Beldock, P. J., and Rabin, J., dissent and vote to reverse the order insofar as appealed from; to direct that the certificates for the shares of stock be delivered and surrendered to the respective appellant corporations upon their payment therefor of the amounts prescribed in the stockholders' agreements; and to declare the respective appellant corporations to be the owners of such certificates, with the following memorandum: Two family-owned corporations are here involved; the stockholders were the decedent and his brothers. They entered into stockholders' agreements with the corporations pursuant to which the corporations undertook to "redeem" or purchase the stock of any deceased stockholder at a fixed price, and the stockholder, in turn, agreed to sell at such price. Such price was required to be paid to the deceased stockholder's estate within 90 days "following the date" of his death. The date of death of the deceased stockholder here was March 28, 1960. The proof discloses that on May 17, 1960, less than two months after his death, Thomas S. San Giacomo, the then president of the two corporations, went to the home of the administratrix (of the deceased stockholder) and told her in effect that the purpose of his visit was to arrange for the corporations' purchase of the deceased's stock pursuant to the agreements. Thereupon they both went to the office of her lawyer, Mr. Maharay, to consummate the purchase. Said Thomas (the president) told the lawyer that he would pay the money now if the lawyer was "ready to draw the papers." The lawyer stated he would require some time to draw the necessary papers and that he would call him (Thomas, the president). A few weeks later Thomas received a letter to the effect that the lawyer no longer represented the administratrix. Thereafter, on June 30, 1960 — four days beyond the 90-day period — another meeting was held by the parties at the office of the administratrix' new lawyer Epstein, at which the president's offer of $15,000 for the stock (the price fixed by the agreements) was summarily rejected as inadequate by Epstein, with the added cryptic comment "That's peanuts." In our opinion, the contractual provision for the payment within the 90-day period following decedent's death was not absolute or peremptory; time was not of the essence, and the parties never attempted to make it so. Therefore, a tender of performance four days later was still good, particularly in the absence of any showing of prejudice. However, even if time was of the essence, here the parties by their conduct must be deemed either to have waived the time limitation or to be estopped from insisting upon it. The corporations, through their president, unequivocally evinced their readiness and willingness to buy the stock within two months after the decedent stockholder's death — long before the expiration of the 90-day period. The consummation of the deal was postponed only for the convenience of the administratrix' original lawyer; he wanted time to draw the necessary papers. Under the circumstances, it must be concluded: (a) that the corporations properly attempted to effectuate the prime purpose of the stockholders' agreements, namely, to keep the corporate stock within the family bounds; and (b) that the administratrix' rejection of the corporations' offer was not only arbitrary but also served to frustrate the agreements. Hence, even if it be assumed that on June 30, 1960, when the corporations again attempted to exercise their contractual right to buy the stock, they were already in default for four days, the administratrix must be deemed to have waived the default. In any event, if she did not waive it, she is estopped from asserting it. She cannot take advantage of that default since it was her conduct or the conduct

of her lawyer which caused the default. It is well established that equity will not permit any person by his own conduct to place another in default and then take advantage of such default. This equitable doctrine is simply the application of the moral precept that no one should be permitted to profit by his own wrong.